1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| A.G., a minor child by and through his Guardian Ad Litem, Alfonso Galindo, Jr.; and R.G., a minor child by and through her Guardian Ad Litem, Alfonso Galindo, Jr., <br><br>           Plaintiffs, <br><br> v. <br><br> UNITED STATES OF AMERICA; and UNITED STATES POSTAL SERVICE, <br><br>           Defendants. | Case No.:  23-CV-745 JLS (KSC) <br><br> **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS** <br><br> (ECF No. 6) |

Presently before the Court is Defendant the United States of America's Motion to Dismiss Plaintiff's Complaint ("Mot.," ECF No. 6) pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  Minor Plaintiffs A.G. and R.G., by and through their guardian ad litem, filed a Response to the Motion ("Opp'n," ECF No. 7), and Defendant filed a Reply in support of the Motion ("Reply," ECF No. 8).  The Court took the matter under submission without oral argument pursuant to Civil Local Rule 7.1(d)(1).  *See* ECF No. 9.  Having carefully reviewed Plaintiffs' Complaint ("Compl.," ECF No. 1), the Parties' arguments, and the law, the Court **GRANTS IN PART AND DENIES IN PART** Defendant's Motion to Dismiss.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# BACKGROUND[1]

Plaintiffs are two young siblings who live in a single-family home with their dog, Pupa. Compl. ¶¶ 4–5, 8–9. A gate and an exterior garage door stand side by side in front of Plaintiffs' home. *Id.* ¶ 8. The front gate opens to an enclosed patio where Plaintiffs play. *Id.* Mail carriers need not pass through the front gate into Plaintiffs' patio to deliver mail, as Plaintiffs' mailbox sits between the garage door and the exterior side of the gate. *Id.* ¶¶ 8, 10.

During the time period relevant here, Plaintiffs' mail was delivered by United States Postal Service ("USPS") mail carrier Nestor Medina ("Medina"). *Id.* ¶ 9. At times, Pupa approached the "interior side of the front gate" when Medina neared Plaintiffs' home; Pupa would bark at Medina but could not get through the gate. *Id.* ¶ 10. On these occasions, Medina used pepper spray on Pupa before reaching Plaintiffs' mailbox. *Id.* After Pupa retreated, Medina would deliver Plaintiffs' mail and move on. *Id.*

Medina repeated the above actions "numerous" times. *Id.* After each occasion, pepper spray residue lingered in Pupa's fur. *Id.* ¶ 11. Plaintiffs, who spent significant time with Pupa every day, ended up "touch[ing] and breath[ing] in" the residual chemicals. *Id.*

These episodes began in the summer of 2018. *Id.* ¶ 9. Around the same time, Plaintiffs both developed symptoms of respiratory illnesses, including shortness of breath and coughs. *Id.* ¶ 12. Multiple medical appointments failed to uncover the cause of Plaintiffs' symptoms. *Id.* Medina continued pepper spraying Pupa until February or 2019, when Plaintiffs' family caught him in the act on a home surveillance video. *Id.* ¶ 13. Medina stopped delivering Plaintiffs' mail after his behavior was reported to the USPS. *Id.* ¶ 14.

/ / /

/ / /

---

[1] The facts alleged in Plaintiffs' Complaint are accepted as true for purposes of Defendant's Motion. *See Vasquez v. Los Angles Cty.*, 487 F.3d 1246, 1249 (9th Cir. 2007) (holding that, in ruling on a motion to dismiss, the Court must "accept all material allegations of fact as true").

Plaintiffs initiated this action on April 21, 2023.  *See* Compl.  Plaintiffs asserted one claim for negligence against the United States and the USPS[2] pursuant to the Federal Tort Claims Act ("FTCA").  *See generally id.*  The instant Motion followed.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(1) allows a party to file a motion to dismiss a case for lack of subject matter jurisdiction.  When a party files such a motion, "there is a presumption of a lack of jurisdiction until the plaintiff affirmatively proves otherwise." *Orient v. Linus Pauling Inst. of Sci. & Med.*, 936 F. Supp. 704, 706 (D. Ariz. 1996).  Where, as here, a defendant makes a facial attack on subject matter jurisdiction, courts must consider the allegations of the complaint to be true and draw all reasonable inferences in the plaintiff's favor.  *See Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004).

Federal Rule of Civil Procedure 12(b)(6), for its part, permits a party to raise by motion the defense that the complaint "fail[s] to state a claim upon which relief can be granted."  The Court evaluates whether a complaint states a cognizable legal theory and sufficient facts in light of Federal Rule of Civil Procedure 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief."  Although Rule 8 "does not require 'detailed factual allegations,' . . . it [does] demand[] more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In other words, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (alteration in original) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  A complaint will not suffice "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Iqbal*, 556 U.S. at 678 (alteration in original) (quoting *Twombly*, 550 U.S. at 557).

---

[2] Because the Court later dismisses the USPS as a defendant in this action, mentions of "Defendant" in this Order refer only to the United States.

To survive a motion to dismiss, then, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570); *see also* Fed. R. Civ. P. 12(b)(6). A claim is facially plausible when the facts pled "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). That is not to say that the claim must be probable, but there must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* Facts "'merely consistent with' a defendant's liability" fall short of a plausible entitlement to relief. *Id.* (quoting *Twombly*, 550 U.S. at 557). This review requires a context-specific analysis that involves the Court's "judicial experience and common sense." *Id.* at 679 (citation omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

Where a complaint does not survive 12(b)(6) analysis, the Court will grant leave to amend unless it determines that no modified contention "consistent with the challenged pleading . . . [will] cure the deficiency." *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992) (quoting *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986)).

## ANALYSIS

In seeking to dismiss this case, Defendant makes four arguments: that (1) this Court lacks subject matter jurisdiction under the FTCA's intentional tort exception; (2) Plaintiffs fail to state a negligence claim; (3) the USPS is not a proper defendant; and (4) Plaintiffs' demands for costs of suit and prejudgment interest should be dismissed or stricken. Mot. at 8–9. The Court addresses each in turn.

## I.    Motion for Lack of Subject Matter Jurisdiction

Defendant asserts that Plaintiffs' negligence claim is really a battery action. *See* Mot at 5–8. If Defendant is correct, the FTCA's "intentional tort exception" bars Plaintiffs' claim and this Court lacks subject matter jurisdiction over this action.

Defendant's argument has two parts.  First, Defendant contends that Plaintiffs are alleging "an intentional tort—trespass to chattel—against their dog."  *Id.* at 5.  Defendant next turns to California's version of the transferred intent doctrine and argues that Medina's "intent to harm the dog transferred to a battery against [Plaintiffs] when the pepper spray made contact with them."  *Id.* at 8.

Defendant's argument invites several difficult questions.  While similar arguments exist in the caselaw, the Parties do not cite—nor could this Court find—any cases that shared similar facts or that broach the relationship between battery and trespass to chattels in the context of the FTCA.  Nevertheless, by applying the relevant statutory framework and tort law concepts, the Court finds that Plaintiffs' claim does not arise from a battery and is thus not barred by the FTCA.

### A.    Applicable Law

Analyzing this issue involves navigating the relationship between the FTCA, the traditional definitions of various torts, and substantive state law.  So, before addressing the Parties' arguments, some background is in order.

### 1.    Federal Tort Claims Act

When a party sues the federal government, subject matter jurisdiction exists only when the law on which such action is based contains an explicit waiver of sovereign immunity, as "[i]t is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction."  *United States v. Mitchell*, 463 U.S. 206, 212 (1983) (footnote omitted).  "[W]hen Congress attaches conditions to legislation waiving the sovereign immunity of the United States, those conditions must be strictly observed . . . ."  *Block v. N. Dakota ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 287 (1983).

The FTCA provides such a waiver, but it is limited.  The statute allows plaintiffs to seek damages against the United States only for certain torts committed by federal employees.  28 U.S.C. §§ 1346(b), 2674.  More specifically, the FTCA "provides a waiver . . . for tortious acts of an agency's employees only if such torts committed in the

employ of a private person would have given rise to liability under state law." *Pereira v. U.S. Postal Serv.*, 964 F.2d 873, 876 (9th Cir. 1992) (citation omitted).

The statutory exceptions listed in 28 U.S.C. § 2680 further narrow the FTCA's waiver of sovereign immunity. *Nurse v. United States*, 226 F.3d 996, 1000 (9th Cir. 2000). If Plaintiffs' claim "fall[s] within one . . . of [those] exceptions, then the federal courts lack subject matter jurisdiction to hear [their] claim[]." *Id.* That said, "these exceptions should be strictly construed." *Ritchie v. United States*, 210 F. Supp. 2d. 1120, 1127 (N.D. Cal. 2002) (citing *Sheehan v. United States*, 896 F.2d 1168, 1170 (9th Cir.), *amended*, 917 F.2d 424 (9th Cir. 1990)); *see also Rayonier Inc. v. United States*, 352 U.S. 315, 320 (1957) ("There is no justification for this Court to read exemptions into the [FTCA] beyond those provided by Congress." (footnote omitted)).

### 2.   *Section 2680's "Intentional Tort Exception"*

Relevant here is § 2680(h), which is sometimes called the "intentional tort exception." *Levin v. United States*, 568 U.S. 503, 507 (2013). That provision excepts "[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, or interference with contract rights" from the FTCA's waiver of immunity. 28 U.S.C. § 2680(h). While the list is comprehensive, "[i]t is also clear § 2680(h) does not include all intentional torts." *Sheehan*, 896 F.2d at 1172. For example, "Section 2680(h) does not remove from the FTCA's waiver . . . conversion and trespass . . . ." *Levin*, 568 U.S. at 507 n.1.

Artful pleaders cannot circumvent § 2680(h) by disguising a barred claim as a permissible one. When evaluating the applicability of the intentional tort exception, courts "look[] beyond the labels used to determine whether a proposed claim is barred under [§ 2680(h)]." *Snow-Erlin v. United States*, 470 F.3d 804, 808 (9th Cir. 2006) (second alteration in original) (quoting *Thomas-Lazear v. FBI*, 851 F.2d 1202, 1207 (9th Cir. 1988)). A claim is barred "[i]f the gravamen of [a plaintiff's] complaint is a claim for an excluded tort under § 2680(h)." *Id.* (citation omitted). In this context, the gravamen of a complaint is defined by "the conduct on which the claim is based." *Id.* (quoting *Mt. Homes,*

*Inc. v. United States*, 912 F.2d 352, 356 (9th Cir. 1990)).  Here, then, Plaintiffs' claim fails if Medina's conduct, as alleged in the Complaint, constitutes a battery.

Even an adequately stated claim for a permissible cause of action can fail under § 2680(h).  "[I]n sweeping language [§ 2680(h)] excludes any claim *arising out of*" specific torts.  *United States v. Shearer*, 473 U.S. 52, 55 (1985).  The provision thus covers claims that "sound" in negligence, for example, but "stem" from an excluded tort.  *See id.*  As a result, a claim is barred if *all* of the conduct underlying it equally constitutes an excluded tort and a non-excluded tort.  *See Sheehan*, 896 F.2d at 1171 ("Such a claim is barred even though the conduct may also constitute a tort other than assault; to hold otherwise would permit evasion of the substance of the exclusion . . . .").  But if a claim relies on at least *some* conduct that does not also support an excluded tort, it survives.  *See id.* ("If, however, the aspect of the conduct upon which plaintiff relies did not constitute an assault, suit is not barred even though another aspect of that conduct may have been assaultive.").

### 3.   Relevant Substantive Law

Defendant contends that California tort law controls for the purposes of the Court's § 2680(h) battery analysis.  Mot. at 6.  Defendant is wrong.

True, when a plaintiff brings a tort claim pursuant to the FTCA, state law defines the elements of that tort.  *See Xue Lu v. Powell*, 621 F.3d 944, 945–46 (9th Cir. 2010).  But "[w]e are here concerned with a question of Federal Court Jurisdiction within the limited waiver of . . . sovereign immunity evidenced by the [FTCA]."  *Woods v. United States*, 720 F.2d 1451, 1453 n.2 (9th Cir. 1983).  So, the issue "is not what constitutes a battery within the meaning of California law, but within the meaning of § 2680(h)."  *Id.*  To evaluate Plaintiffs' claim, then, the Court must use the definition of battery "that was 'traditional,' 'commonly understood,' or 'established' when [the] FTCA was enacted."  *Sheehan*, 896 F.2d at 1170 (citing *Block v. Neal*, 460 U.S. 289, 296 (1983)).

/ / /

/ / /

/ / /

"The Ninth Circuit refers to the Restatement of Torts" in these circumstances. *Shipman v. United States*, No. 3:21-CV-00606, 2021 WL 7904044, at \*2 (D. Or. Dec. 28, 2021), *report and recommendation adopted*, 2022 WL 981090 (D. Or. Mar. 30, 2022); *see also Sheehan*, 896 F.2d at 1171–72 (relying on the Second Restatement of Torts for the elements of intentional torts in the context of § 2680(h)).

### B. Application

To situate the above principles in the context of this case, the Court summarizes the applicable framework as follows. Plaintiffs' negligence claim survives § 2680(h) in either of two scenarios. First, their claim is not barred if the conduct alleged in the Complaint does not constitute—*i.e.,* satisfy the elements of—a battery. Alternatively, Plaintiffs' claim survives if some aspect of Medina's alleged conduct (i) supports a non-excluded tort claim, but (ii) is not relevant to battery. And in this analysis, the Court is guided by the Restatement, not California law. Having set the ground rules, the Court turns to Defendant's argument.

### 1. Restatement's Definition of Battery

Per the Restatement, "[a]n actor is subject to liability to another for battery if (a) he acts intending to cause a harmful or offensive contact with the person of the other . . . and (b) a harmful contact with the person of the other directly or indirectly results." Restatement (Second) of Torts ("Restatement"[3]) § 13 (Am. L. Inst. 1965).

The Court addresses the second element first, as it is easily handled. To be liable for a battery, Medina's conduct must have resulted in Plaintiffs experiencing a "harmful" bodily contact. *See id.* Here, Plaintiffs "both touched and breathed in the chemical residue from the pepper spray" that Medina had earlier used on Pupa. Compl. ¶ 11. This exposure caused Plaintiffs to develop respiratory illnesses. *Id.* ¶ 15. Thus, Medina's conduct resulted in a harmful physical contact between Plaintiffs and the pepper spray.

---

[3] Unless otherwise noted by the Court, mentions of—and citations to—the "Restatement" refer to the Second Restatement of Torts.

Medina's intent poses a more complicated question.  Under the Restatement, an actor must intend "to produce the harm that ensues; it is not enough that [the actor] intend[] to perform the act."  Restatement § 870 cmt. b.  "All consequences which the actor desires to bring about are intended," *id.* § 8A cmt. b, but nothing in the Complaint suggests Medina consciously "desire[d]" to create a contact between his pepper spray and Plaintiffs, *see* Compl. ¶ 10 ("[Medina] would use pepper spray . . . and move on to the next home.").  However, if Medina "[knew] that the [contacts were] certain, or *substantially certain*, to result from his act[s], . . . he is treated by the law as if he had in fact desired" said contacts to occur.  Restatement § 8A cmt. b (emphasis added).

### 2.    Intent Requirement: Substantial Certainty

Given the above, determining whether Medina had the requisite intent for battery requires the Court to ask if—at the time Medina pepper sprayed Pupa[4]—it was "substantially certain" that Plaintiffs would also suffer a harmful contact with the spray.  Drawing all reasonable inferences from the Complaint in Plaintiffs' favor, the Court concludes it was not.

Substantial certainty sits on the same continuum of culpability as recklessness and negligence, with substantial certainty lying toward the more culpable end of the spectrum.  Which label applies in any given case is a question of foreseeability.  "As the probability that the [harmful] consequences will follow decreases, and becomes less than substantial certainty, the actor's conduct loses the character of intent, and becomes mere recklessness . . . ."  *See id.*  Recklessness, for its part, involves acting in the face of "facts which create a high degree of risk of physical harm to another."  *Id.* § 500 cmt. a.

Accordingly, courts have set a high bar for finding substantial certainty.  *See, e.g.*, *Mein v. Cook*, 193 P.3d 790, 796 (Ariz. Ct. App. 2008) ("In this context, 'substantially certain' means nearly certain.");  *Erickson v. Canyons Sch. Dist.*, 467 P.3d 917, 923

---

[4] "[C]ulpability is generally measured against the knowledge of the actor at the time of the challenged conduct."  *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 105 (2016).

(Utah Ct. App. 2020) ("[To show substantial certainty] a party must show that the actor believed that the legally harmful or offensive contact was essentially unavoidable."); *Charkhian v. Nat'l Envtl. Testing*, 907 F. Supp. 961, 964 (M.D. La. 1995) ("The term has been interpreted as being equivalent to 'inevitable,' 'virtually sure' and 'incapable of failing.'" (footnote omitted)).

Prototypical examples of substantial certainty confirm this high threshold. *See, e.g.*, Restatement § 8A cmt. b, illus. 1 ("A throws a bomb into B's office . . . . A knows that C, B's stenographer, is in the office. A has no desire to injure C, but knows that his act is substantially certain to do so."); *United Specialty Ins. Co. v. Cole's Place, Inc.*, 936 F.3d 386, 405 (6th Cir. 2019) ("The man who fires a bullet into a dense crowd may fervently pray that he will hit no one, but since he must believe and know that he cannot avoid doing so, he intends it." (quoting *Graves v. Dairyland Ins. Grp.*, 538 S.W.2d 42, 44 (Ky. 1976)).

Here, the facts do not suggest that Medina knew to a substantial certainty that Pupa would interact with anyone while pepper spray remained in Pupa's fur. Beginning in the summer of 2018, Medina would spray Pupa and then move away from Plaintiffs' home. Compl. ¶¶ 9–10. Plaintiffs would not touch the pepper spray until later, when they played with Pupa. *See id.* ¶ 11. Though these episodes would recur "numerous" times over a period of months, Plaintiffs' family did not discover Medina's behavior until February 2019. *See id.* ¶¶ 10, 13. The Court can infer from these facts that no one was outside Plaintiffs' home, and thus in danger of encountering residual pepper spray, around the time of Medina's visit.

Nor does it appear that Medina must have known, to a substantial certainty, that the amount of spray he discharged would pose a risk to those later interacting with Pupa. Plaintiffs began exhibiting respiratory symptoms soon after their initial exposure to the pepper spray. *See id.* ¶¶ 11–12. And yet, Plaintiffs' family members appear not to have noticed residual pepper spray in their home or on Pupa; despite taking Plaintiffs to "multiple urgent care and pediatrician" appointments, the cause of Plaintiffs' symptoms

remained unknown.  *See id.* ¶ 12.

Because the conduct alleged in the Complaint fails to show the required intent, the conduct does not constitute a battery.  The Court thus finds that Plaintiffs' claim does not arise from a battery within the meaning of § 2680(h).

### 3.  *Transferred Intent*[5]

Defendant cannot use the doctrine of transferred intent to change this conclusion. Under its broadest formulation, the doctrine treats an actor "who possesses intent A . . . as possessing intent B," and thereby subjects him or her to "liability for the tort of which intent B is a necessary element."  Restatement (Third) of Torts: Inten. Torts to Persons § 110 cmt. b (Am. L. Inst., Tentative Draft No. 1, 2015).  However, the doctrine applies more narrowly than the above description suggests.

Rather than adopting transferred intent wholesale, the Restatement "fragments" the doctrine by baking it into the definitions of individual torts.  *See* Dan B. Dobbs et al., *The Law of Torts* § 45 (2d ed. 2011).  Specifically, the Restatement defines each tort to include two categories of cases.  One might call the first category "intended tort, unintended victim."  In such cases, "the tort was intended," but the resulting victim was not.  *Id.* § 45 n.11.  The second group can be labeled "unintended tort, intended victim" cases: an actor intends one tort but commits a different one against an intended victim.  *Id.*  The instant case, based on the facts alleged in the Complaint, falls into neither category.

Even under Defendant's argument, the events alleged in the Complaint do not fit the description of an *intended-tort*-but-unintended-victim scenario.  Defendant contends that Medina had the intent required to commit a "trespass to chattels . . . against [Plaintiffs'] dog," but that an *unintended tort* (battery) harmed unintended victims (Plaintiffs).  *See* Mot. at 5–6.

/ / /

---

[5] For the purposes of this discussion, the Court presumes but does not decide that the Complaint alleges facts sufficient to constitute a trespass to chattels.

23-CV-745 JLS (KSC)

Nor do Plaintiffs' allegations fit the Restatement's description of an unintended tort, intended victim case. This is because the Restatement restricts which *intended* torts can provide the requisite intent to create liability for an *unintended* battery. The list is short; it consists of just two torts, neither of which is trespass to chattels.[6] One is assault. *See* Restatement § 16(1) ("If an act is done with the intention . . . of putting another in apprehension of either a harmful or offensive bodily contact, and such act causes a bodily contact to the other, the actor is liable . . . ."). The other is battery itself. One who intends "an *offensive but not a harmful* bodily contact" is liable for battery "although the act was not done with the intention of bringing about the resulting bodily harm." *Id.* (emphasis added).

That the Restatement limits the list to assault and battery is not surprising, as both actions protect closely related interests. An intended assault can support liability for an unintended battery because one's "interest in freedom . . . from the apprehension" of "harmful or offensive" contacts is "so far a part of" the interest invaded by a battery: the "interest in [one's] bodily security." *Id.* § 16 cmt. a. The connection is so tight that the intent to violate one interest suffices to hold an actor liable for the resulting violation of the other. *See id.*

Trespasses to chattels, on the other hand, implicate a different set of interests. Rather than discussing bodily security, the Restatement describes that action as protecting interests in "the physical condition and use of chattels," "the retention of the possession of chattels," and "the availability of chattels to immediate or future possession." *Id.* div. 1, ch. 9, scope note. Further illustrating the difference, the Restatement slots battery and assault in the same chapter heading: "Intentional Invasions of Interests in Personality." *See generally id.* div.1, ch. 2. Meanwhile, trespass to chattels falls under a separate

---

[6] In a section titled "Transferred Intent," a proposed update to the Restatement maintains the same restrictions. *See* Restatement (Third) of Torts: Inten. Torts to Persons § 110(b) (Am. L. Inst., Tentative Draft No. 1, 2015) ("For purposes of liability for battery, the intent requirement . . . is satisfied if the actor either intends to cause a contact with the person of another or intends to cause the other to anticipate an imminent . . . contact . . . .").

chapter: "Intentional Invasions of Interests in the Present and Future Possession of Chattels." *See id.* div.1, ch. 9.

Nothing in the Restatement thus suggests that the intent to commit a trespass to chattels can "transfer" and give rise to liability for battery.

### C.   *California Law*

Even if California law applied, Defendant's argument would fail.  To establish the contours of California's version of transferred intent, Defendant relies principally on *Singer v. Marx*, 301 P.2d 440 (Cal. Ct. App. 1956).  There, a young boy tried to throw a rock at one girl but accidentally hit another, and the court applied the doctrine of transferred intent.  *See id.* at 441–43.  The court explained that "if the defendant did an illegal act which was likely to prove injurious to another, he is answerable for the consequence which directly and naturally resulted."  *Id.* at 443 (quoting *Lopez v. Surchia*, 246 P.2d 111, 113 (Cal. Ct. App. 1952)).  The boy could thus be held liable for battery, as the "direct, natural and probable consequence" of "unlawfully aim[ing] at one person" is "hit[ting] another."  *Id.* (quoting *Lopez*, 246 P.2d at 113).

But *Singer* poses the same challenges to Defendant as the Restatement does.  For one thing, the rule *Singer* adopts also requires a certain degree of foreseeability; the court extends liability to the "direct, natural, and probable consequence[s]" of unlawful acts.  *Id.*  While this standard seems to demand something less than substantial certainty, the word "direct"—along with *Singer*'s reasoning—suggests that transferred intent applies when "unlawful" acts have immediate consequences that resemble the actor's originally-intended results.  Indeed, the boy in *Singer* threw a rock *with the intention of hitting someone*; that the thrown rock *did* hit someone immediately thereafter is hardly surprising.  *Singer* also fits squarely within Restatement's version of transferred intent as a case of an intended tort and an unintended victim; the boy *intended a battery* and a *battery* resulted.

*Singer* thus bears little factual resemblance to the instant case, which exhibits both greater temporal separation between the alleged intentional conduct and its harmful consequences, as well as dissimilar torts—battery and trespass to chattels.   Another

California case Defendant cites is distinguishable on the same grounds. *See Meza v. City of Palm Springs*, No. ED CV 14-00509, 2014 WL 12965997, at *2–3 (C.D. Cal. Sept. 23, 2014) (applying transferred intent when police shot at a moving vehicle and hit plaintiff).

Defendant downplays the above aspects of *Singer* by asserting that (i) California caselaw does not require harmful consequences to be particularly foreseeable in transferred intent cases, and (ii) the differences between battery and trespass to chattels do not prevent transferred intent from applying. Neither argument proves persuasive.

### 1. Foreseeability

Defendant's foreseeability argument relies on *People v. Roberts*, 826 P.2d 274 (Cal. 1992), *as modified on denial of reh'g* (May 20, 1992). Reply at 4. Per Defendant, *Roberts* "favorably cite[s] transferred intent cases where the defendant did not directly contact the unintended victim, and where intermediary causal links were required to consummate the wrongful contact." *Id.*

Defendant's portrait of *Roberts* is not convincing. Both cases cited by *Roberts* entail intentional unlawful acts that have immediate and, arguably, substantially certain consequences. This makes sense, as *Roberts* itself addressed the limits on transferred intent doctrine. Along with caselaw, the court cited favorably to the Model Penal Code for the proposition that an "actor is not liable for an unintended . . . result unless, as relevant here, 'the actual result involves *the same kind of injury* . . . as that designed or contemplated and is *not too remote or accidental*.'" *Roberts*, 826 P.2d at 300 (emphases added) (quoting Model Pen. Code § 2.03(2)(b)).

In the first case cited by *Roberts*, *Wright v. State*, "the defendant, driving one car, fired at an intended victim in another. The target 'rapidly accelerated his car while ducking bullets and ran over and killed a pedestrian.'" *Id.* (internal quotations omitted) (citing 363 So.2d 617, 618 (Fla. Dist. Ct. App. 1978)). Technically, "the defendant did not directly contact the unintended victim," Reply at 4, but that is beside the point. *Wright's* decision to shoot at a moving car led directly to the result that, to borrow the Restatement's wording,

was "substantially certain" to occur.  The intended victim was driving on a road near pedestrians.  Naturally, the driver tried to dodge the bullets Wright shot, and *during* that exchange a pedestrian was hit.  Perhaps *Wright* would be more relevant if the Complaint alleged, say, that Medina pepper sprayed Pupa and hit Plaintiffs as they played nearby.  But as this case currently stands, *Wright* provides little guidance.

The second case, *Madison v. State*, proves just as unhelpful to Defendant. There, the court "implied" intent in a murder case "when the defendant threw a hand grenade at one [person] who, presumably impulsively, kicked it to another who was killed." *Roberts*, 826 P.2d at 300 (citing 130 N.E.2d 35 (Ind. 1955)).  Defendant thus argues that transferred intent can apply "where intermediary causal links were required to consummate the wrongful act." Reply at 4. And again, Defendant is technically correct.  But the intervening factors in *Madison* bear little resemblance to the facts alleged in the Complaint.  Madison threw a live explosive device at one person while another was within kicking distance; in doing so, Madison would have been substantially certain that harm could befall anyone in the proximity of the grenade.  The "intermediary" link—the intended victim's kicking of the grenade—does little to change those facts.

Moving beyond *Roberts*, Defendant next attempts to lower the threshold at which intent can be imputed by analogizing the doctrine of transferred intent with the "rules of causation for intentional torts."  Reply at 5.  In intentional tort cases, California uses the substantial factor test, which "generally produces the same results as does the 'but for' rule of causation." *Bank of New York v. Fremont Gen. Corp.*, 523 F.3d 902, 909 (9th Cir. 2008).  Under this standard, "that the actor's conduct becomes effective in harm only through the intervention of new and independent forces for which the actor is not responsible is of no importance." *Id.* (quoting *Tate v. Canonica*, 5 Cal. Rptr. 28, 35 (Ct. App. 1960)).  That is because "the notion of independent intervening cause has no place in the law of intentional torts, so long as there is a factual chain of causation."  *Id.* at 910 (emphasis omitted) (quoting *United States Fid. & Guar. Co.*, 205 Cal. Rptr. 460, 465 (Ct. App. 1984)).  As "Plaintiffs allege a factual chain of causation" between Medina's pepper spray and their

injuries, Defendant seems to argue, the doctrine of transferred intent ought to apply here. *See* Reply at 5.

Intent—and the foreseeability question embedded in it—is not, however, synonymous with causation. Intent is a matter of culpability. Acts done intentionally, recklessly, or negligently can all be tortious, "but the liability attached to them will differ." Restatement § 8A cmt. b. "[R]esponsibility for harmful consequences should be carried further in the case of one who does an intentionally wrongful act." *Id.* § 435B cmt a. Courts may thus apply a broader rule of *causality*, allowing defendants to be liable for harmful results "whether or not [they were] expectable," precisely *because* they acted intentionally. *See id.* § 435A. That logic does not work in reverse to lower the threshold at which courts find *intent* to commit a tort.

Defendant thus identifies neither California caselaw suggesting the doctrine of transferred intent applies in circumstances like those described in the Complaint, nor any policy-based reason that it should.

### 2. Transferring Intent from Trespass to Chattels to Battery

Defendant next argues that the transferred intent doctrine applies not just to "torts against persons," but also where "a tort against an animal is intended." Mot. at 7. Defendant points to two cases, both involving a law enforcement officer that accidentally shot a person after attempting to shoot a dog, in which courts applied transferred intent. *See Bailey v. Cnty. of San Joaquin*, 671 F. Supp. 2d 1167, 1171, 1175 (E.D. Cal. 2009); *Rivera v. Garza*, No. CV H-20-3333, 2021 WL 2533566, at *1–2 (S.D. Tex. June 21, 2021).

The Court first notes that this question is more open than Defendant suggests, as illustrated by the very cases Defendant cites. *Bailey* held, with minimal analysis, that transferred intent did not "require[] the intended party to be a person" only after noting the lack of caselaw on the issue. 671 F. Supp. 2d at 1175 n.3. *Rivera* provides even less support. There, the plaintiffs' claims arose under the Texas Tort Claims Act ("TTCA"). *See Rivera*, 2021 WL 2533566, at *1–2. Unlike the FTCA, the Texas statute bars claims

"aris[ing] out of" *any* intentional tort. *Id.* at *2. The court's inquiry thus ended after it determined that the defendant committed a trespass to chattels. *See id.* ("Because they are rooted in an intentional tort, the . . . claims against the City under the [TTCA] will be dismissed."). The court did not decide, nor even discuss, whether the plaintiffs' claims constituted batteries. *See generally id.* at *1–4. *Rivera* mentions the doctrine of transferred intent only in dicta, explaining that the defendant's conduct was "intentional" though he had not intended to shoot the plaintiffs. *See id.* at *2 ("His lack of intent to shoot the Riveras is also irrelevant as the transferred intent doctrine *would* shift his intent . . . ." (emphasis added)). Other authorities also note the uncertainty surrounding this issue. *See, e.g.*, Dobbs et al., *supra*, § 45 ("It has been *suggested* that the doctrine *could* apply as between any two trespassory torts, *including, perhaps, property torts* as well as personal torts." (emphases added and footnote omitted)).

Even if the Court presumed that the intent to commit a trespass to chattels can *sometimes* transfer to an intent to commit a battery, it would not follow that such a transfer was *always* possible. Far from supporting Defendant's argument, *Rivera* and *Bailey* reinforce the same idea as do *Singer* and the Restatement: transferred intent doctrine applies when tortious acts have immediate, predictable consequences that resemble the results the actor intended to bring about. Like the boy in *Singer*, who intended to throw a rock at one child and struck another, the officers in *Bailey* and *Rivera* intended to shoot something and shot nearby bystanders. The instant case is different; Medina did not miss his intended target and pepper spray Plaintiffs.

Defendant's final argument is similarly misguided. Defendant cites *Logan v. City of Pullman Police Dep't* ("*Logan II*"[7]), No. CV-04-214, 2006 WL 994754 (E.D. Wash. Apr. 10, 2006), for the proposition that "the transferred intent doctrine has been applied

---

[7] *Logan II* incorporates the facts summarized in an earlier order from the same case. *See* 2006 WL 994754 at *1. The Court will refer to that earlier order, *Logan v. City of Pullman*, 392 F. Supp. 2d 1246 (E.D. Wash. 2005), as "*Logan I*." When referencing the facts underlying the entire case, the Court will refer simply to "*Logan*."

where pepper spray was deployed" and "injur[ed] others beyond the intended recipient." Mot. at 7.  In that case, law enforcement officers used pepper spray[8] while inside a building to break up a fight.  *Logan II*, 2006 WL 994754 at *3.  Others inside the building "suffered secondary effects," though they "were not sprayed directly."  *Id.* at *4.  The court concluded that "the Officers' intent with respect to the those [sic] individuals who were directly sprayed by O.C. transfers to all of the plaintiffs who were inside the building when the O.C. was sprayed."  *Id.*

Unfortunately for Defendant, the facts underlying *Logan* more closely resemble those of *Singer*, *Wright*, *Madison*, *Bailey*, and *Rivera* than those alleged in the Complaint. As in *Wright* or *Madison*, for example, the high risk of harm to non-targeted individuals would have been clear to the officers in *Logan*.  *Logan* took place in a busy area at a busy time: in a two-story building, which housed a restaurant and a night club, during a Saturday-evening fraternity party.  *See Logan I*, 392 F. Supp. 2d at 1254–55.  And the officers appear to have sprayed a large quantity of chemicals without focusing on one target; three officers sprayed "toward" a group of twenty-six to thirty-eight people who were fighting in the first-floor restaurant.  *See id.* at 1256.  Also noteworthy is the timing of the intended act and its unintended consequences.  Like the rock thrown in *Singer*, or the bullets shot in *Bailey* and *Rivera*, the pepper spray in *Logan* "*immediately* diffused through the building" and reached the unintended victims upstairs.  *Id.* (emphasis added). As the Court has already explained, the facts alleged in the Complaint suggest that similarly obvious risk factors were not present, and similarly immediate consequences did not occur, when Medina pepper sprayed Pupa.

Nor can Defendant avoid *Logan*'s factual dissimilarities by drawing a parallel between the "ducts" in *Logan*, which carried the pepper spray through the building, and Pupa.  *See* Reply at 7 n.3.  Defendant frames both the ducts and the dog as "conduits

---

[8] The officers used oleoresin capsicum spray, also known as O.C. or pepper spray.  *See Logan I*, 392 F. Supp. 2d at 1253 n.3.

through which unintended victims suffered alleged injury from an alleged intentional tort." *Id.* But the issue of intent hangs on questions relating to foreseeability, whether framed in terms of substantial certainty, per the Restatement, or in terms of direct, natural, and probable consequences, as under the doctrine of transferred intent. That the ducts and the dog served as "conduits" simply does not speak to that issue.

In light of the foregoing, the Court **DENIES** Defendant's Motion to Dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1).

**II.     Motion for Failure to State a Claim**

Defendant makes the alternative argument that Plaintiffs fail to state a negligence claim because the Complaint "alleges only intentional conduct." Mot. at 9. For the reasons that follow, the Court cannot agree.

### A.     Applicable Law

As the Court is no longer interpreting § 2680(h), California tort law applies here. *See United States v. Neustadt*, 366 U.S. 696, 705 n.15 (1961) ("[W]hen a claim is not barred by one of the [FTCA]'s exclusionary provisions, the liability of the Government must be determined 'in accordance with the law of the place where the act or omission occurred.'" (quoting 28 U.S.C. § 1346(b))); *see also Xue Lu*, 621 F.3d at 946–47 ("The FTCA incorporates the law of the state in which the tort is alleged to have occurred, in this case California, so that we are bound to interpret and apply the law California would.").

To state a negligence claim under California law, Plaintiffs must demonstrate "a legal duty to use due care, a breach of such legal duty, and [that] the breach [is] the proximate or legal cause of the resulting injury." *Kesner v. Superior Ct.*, 384 P.3d 283, 289 (Cal. 2016) (alterations in original) (quoting *Beacon Residential Cmty. Assn. v. Skidmore, Owings & Merrill LLP*, 327 P.3d 850, 853 (Cal. 2014)).

/ / /

/ / /

/ / /

/ / /

### *B.     Intentional Conduct and Negligence Claims*[9]

The line between intentional and negligent acts is murkier than Defendant suggests. True, California has, to an extent, "codifie[d] the common law dichotomy of intentional torts and negligence." *Mahoney v. Corralejo*, 112 Cal. Rptr. 61, 64 (Ct. App. 1974).  But tortious conduct cannot be so easily labeled.  Rather, "human conduct fits along a continuum which passes from totally innocent conduct through slight negligence, negligence, gross negligence, willful and wanton or reckless conduct, and finally to intentional misconduct." *Am. Emp.'s Ins. Co. v. Smith*, 163 Cal. Rptr. 649, 652–53 (Ct. App. 1980).

While it is "seldom, if ever, necessary for a court to determine the precise point on the continuum . . . any given conduct fits," *id.* at 653, each category of conduct comes with different legal consequences, *see Mahoney*, 112 Cal. Rptr. at 64 ("California has recognized various degrees of negligence which invoke various legal consequences.").  For example, and as discussed above, intentional tortfeasors may be "held liable for a broader range of consequences" than negligent actors.  *Thing v. La Chusa*, 771 P.2d 814, 819 (Cal. 1989) (*quoting Amaya v. Home Ice, Fuel & Supply Co.*, 379 P.2d 513, 525 (Cal. 1963), *overruled on other grounds by Dillon v. Legg*, 441 P.2d 912 (Cal. 1968)).

Courts have thus policed the line between intentional and negligent actions closely when a plaintiff tries to increase a defendant's liability by recharacterizing less blameworthy conduct as a more grievous wrong, like in *Donnelly v. S. Pac. Co.*, 118 P.2d 465 (Cal. 1941).  There, a passenger sought to frame a train conductor's actions as more than negligent.  *See id.* at 466–67.  A favorable ruling could have allowed the passenger to seek punitive damages and avoid confronting a contributory negligence defense.  *See id.* at 469.  But the California Supreme Court drew a line distinguishing

---

[9] For the purposes of this discussion, the Court presumes, but does not decide, that Medina's alleged conduct was "intentional" in the sense relevant to intentional torts, *i.e.,* that Medina "inten[ed] 'the consequences of [his] act[s],' not simply 'the act[s] [themselves].'" *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998) (emphasis omitted) (quoting Restatement § 8A cmt. a).

willful and negligent conduct.  *See id.* at 468 ("If conduct is negligent, it is not willful; if it is willful, it is not negligent.").  Though the court also noted that some acts may have "characteristics of both negligence and willfulness," *id.* at 468, it held that the passenger could not turn allegations of "careless[ness]" into more blameworthy conduct, *id*. at 470.

Though seemingly on-point, *Donnelly* does not support Defendant's argument.  This is in part because *Donnelly*'s holding was premised on *federal* substantive law.  *See generally id.* at 469–70.  In fact, the court may have come to a different conclusion under California law.  *See id.* at 470 ("This negligence may have been 'gross' under the California rule but the federal cases are clear . . . .").  But more importantly, *Donnelly* does not address the question at issue here.  The court in *Donnelly* had to decide whether evidence supporting a negligence claim could also establish more serious wrongdoing.  *See generally id.*  Most "[d]ecisional law has distinguished negligence from willful or intentional misconduct in *that* context."  *Am. Emp.'s Ins.*, 163 Cal. Rptr. at 651 (emphasis added).  But the instant case presents the opposite question: whether intentional misconduct can support a showing of negligence.  This distinction is key.  *See generally id.*

*American Employer's Insurance* proves much more instructive.  There, the defendant was accused of negligently setting a fire.  *See id.* at 650–51.  On appeal, he argued against negligence liability on the grounds that the plaintiff's claim was necessarily for an intentional tort.[10]  Before approaching the merits of the argument, the court distinguished *Donnelly*, noting that "[n]o appellate decision ha[d] dealt with litigants in this posture."  *Id.* at 651.  The court then considered the relationship between culpability

/ / /

/ / /

/ / /

---

[10] The case's unique posture resulted from the parties' attempts to navigate an indemnification issue.  *See Am. Emp.'s Ins.*, 163 Cal. Rptr. at 651 ("It is clear that plaintiffs do not desire a judgment for intentional or willful misconduct since such a judgment would preclude indemnification by defendant's insurer.").  But the question of insurance coverage was itself not before the court.  *Id.* at 654.

and liability, explaining,

> Whether any particular conduct is sufficiently culpable to support the imposition of liability is a question of fact for the trier of fact.  The question for a court is whether the evidence, judged in the light most favorable to the prevailing party, supports the finding of the trier of fact.  This question is answered when the court determines whether the conduct shown by the evidence passes the minimum threshold necessary to impose liability.

*Id.* at 653 (internal citations omitted).  So, the court reasoned, "[i]t is generally *irrelevant* the evidence might also support a finding that the conduct was of a *more culpable* nature." *Id.* (emphases added).

*American Employer's Insurance* thus announced the rule that "it is not a defense to negligence to contend that the conduct was willful or the harm intended." *Id.*  And other courts encountering similar issues have followed that rule.  *See Atain Specialty Ins. Co. v. Slocum*, No. 1:19-CV-0247, 2019 WL 6918273, at *7 (E.D. Cal. Dec. 19, 2019); *T.B. ex rel. G.B. v. Chico Unified Sch. Dist.*, No. 2:07-CV-926, 2008 WL 5382060, at *1–2 (E.D. Cal. Dec. 22, 2008); *Krause v. W. Heritage Ins. Co.*, No. G041405, 2010 WL 2993991, at *14 (Cal. Ct. App. Aug. 2, 2010) ("Plaintiffs have the prerogative to sue for negligence, rather than intentional tort." (footnote omitted)).  *But see Harris v. Recek*, No. F066213, 2014 WL 3509986, at *3 (Cal. Ct. App. July 16, 2014).

The cases Defendant cites in opposition arise out of a distinct legal context that is, at best, distantly related to the issues presented here.  Said cases thus fail to persuade this Court to depart from *American Employer's Insurance*.  To fully explain its reasoning, the Court must take a brief detour into California employment law.

California's workers' compensation regime generally provides the exclusive means through which an employee can recover for workplace injuries.  *See* Cal. Lab. Code § 3602 (West).  An exception exists when a claim is based on "alleged acts or motives" that do not constitute "a risk reasonably encompassed within the compensation bargain." *Charles J. Vacanti, M.D., Inc. v. State Comp. Ins. Fund*, 14 P.3d 234, 249 (Cal. 2001) (quoting *Shoemaker v. Myers*, 801 P.2d 1054, 1063 (Cal. 1990)).  But "motive" has a unique

definition in workers' compensation cases.  "In the exclusivity context, motive refers to the purpose or reason behind the acts and *not* the intentional or negligent nature of these acts."  *Id.* at 250 (citation omitted).

*Cole v. Fair Oaks Fire Prot. Dist.* explained that this context-specific definition of motive is necessary because employer actions are "inherently" intentional. *See* 729 P.2d 743, 750 (Cal. 1987).  Considering whether exclusive remedy provisions barred a claim for intentional infliction of emotion distress ("IIED"), the *Cole* court noted,

> An employer's supervisory conduct is inherently 'intentional.'. . . [E]very employer must on occasion review, criticize, demote, transfer and discipline employees.  Employers are necessarily aware that their employees will feel distressed by adverse personnel decisions, while employees may consider any such adverse action to be improper and outrageous.  Indeed, it would be unusual for an employee *not* to suffer emotional distress as a result of an unfavorable decision by his employer.

*Id.*  Allowing employees to bypass exclusivity whenever an "employer act[ed] with the purpose of causing emotional distress" would, therefore, "throw open the doors to numerous claims already compensable under the compensation law."  *Id.*  Accordingly, the court held that "an employee suffering emotional distress" could "not avoid the exclusive remedy provisions."  *Id.*

Though it discussed only the policy implications of allowing IIED claims to avoid a statutory remedial scheme, later cases cited *Cole*, without providing additional analysis, to bar employees from bringing claims for *negligent* infliction of emotional distress ("NIED").  One such case, *Semore v. Pool*, relies exclusively on *Cole*.  *See* 266 Cal. Rptr. 280, 291 (Ct. App. 1990) ("'An employer's supervisory conduct is inherently "intentional."' The conduct alleged here does not support a cause of action for [NIED]." (citation omitted)).  The court in *Edwards v. U.S. Fidelity and Guaranty Company* did the same, except it relied solely on *Semore.*  *See* 848 F. Supp. 1460, 1466 (N.D. Cal. 1994), *aff'd*, 74 F.3d 1245 (9th Cir. 1996) ("'[A]n employer's supervisory conduct is inherently "intentional."'"  Thus, where the conduct alleged is intentional, it

cannot be used as a basis for a[n] [NIED] claim." (citation omitted)).  *Walker v. Boeing Corporation* followed suit, relying solely on *Edwards*.  *See* 218 F. Supp. 2d 1177, 1185 (C.D. Cal. 2002) ("Moreover, because Walker's termination was an *intentional* act, it also cannot give rise to a claim for [NIED]." (footnote and citation omitted)).

This leads back to Defendant's argument.  Defendant does not reference *Cole*, *Semore*, *Edwards*, or *Walker*.  However, most of the authorities Defendant *does* cite rely entirely on those four cases.  *See* Mot. at 8–9.  *Bernal v. United Parcel Service Co.*, for example, cites *Walker* and *Semore* and states that "[i]ntentional conduct cannot form the basis of a negligence action."  No. EDCV 08-01579, 2009 WL 10671151, at *8 (C.D. Cal. Dec. 8, 2009).  Similarly, *Monaghan v. El Dorado County Water Agency* uses *Semore* and *Edwards* to dismiss a negligence claim that was based on "evidence only describe[ing] intentional acts."  No. 2:10-CV-00434, 2012 WL 397769, at *9 (E.D. Cal. Feb. 7, 2012). Rounding out the trio is *Dayton v. Modesto Irrigation District*, No. CV-F-06-1076, 2007 WL 4107904 (E.D. Cal. Nov. 16, 2007).  There, the court claimed that *Semore* and *Edwards* "both . . . stand for the proposition that an intentional act cannot give rise to a claim for NIED."  *Id.* at *13.

In this Court's view, the above cases have little bearing on the matter at hand.  The decision in *Cole*—and, by extension, those in *Semore, Edwards*, and *Walker*—was premised on policy considerations that stemmed from specific claims (emotional distress actions) in a discrete area of law (California's workers' compensation regime).  To the extent any of these cases purported to transform *Cole* into the general rule that intentional conduct can never support a negligence suit, and it is not clear to this Court they intended to, they cite no supporting authority in doing so.  Moreover, Defendant makes no attempt to connect *Bernal*, *Monaghan*, or *Dayton* to the present issue.  *See generally* Mot.  The Court thus respectfully declines to follow those decisions, and instead applies the holding and logic of *American Employer's Insurance*.

/ / /

/ / /

24

Additionally, many of the above cases are more plausibly read to stand for the uncontroversial principle that conduct, whether intentional or otherwise, cannot constitute negligence unless it violates some duty of care.  *See, e.g., Monaghan*, 2012 WL 397769, at *9 ("Plaintiff fails to specify exactly *what* conduct constituted negligence. . . . [T]he court cannot deduce how [the defendant's conduct] gave rise to any duty of care.").  The Court also reads Defendant's remaining cases that way.  Defendant quotes *Orn v. City of Tacoma*, which stated that "[i]t is of course true that battery is an intentional tort, and that the intentional act of shooting Orn, by itself, cannot support a negligence claim."  No. C13-5974, 2018 WL 1961067, at *1 (W.D. Wash. Apr. 27, 2018).  But Defendant leaves out the court's next statement, which explains why Orn's negligence claim survives summary judgment.  *See id.* ("But the claim . . . is based on the totality of the circumstances leading up to the shooting—the failures to follow policies and orders.").[11]  Like *Monaghan*, *Orn* thus suggests that a bare assertion of intentional conduct, without the company of a plausible assertion of a breached legal duty, cannot support a negligence claim.  Defendant's final case can be read much the same way.  *See Sanders v. Madden*, No. B316082, 2023 WL 164922, at *7, 7 n.11 (Cal. Ct. App. Jan. 11, 2023).

The Court thus rejects Defendant's argument and finds that negligence claims can be based on allegations of intentional misconduct.

### C.  Adequacy of Plaintiffs' Claim

That plaintiffs *can* base negligence claims on intentional conduct does not mean intentional conduct *always* supports a finding of negligence.  The Court must thus separately determine whether the Complaint sufficiently states a negligence claim.  "[T]o establish negligence under California law," Plaintiffs must "establish four required elements: (1) duty; (2) breach; (3) causation; and (4) damages."  *Ileto v. Glock Inc.*, 349 F.3d 1191, 1203 (9th Cir. 2003) (citations omitted).

---

[11] The Court also notes that *Orn* does not involve California law.  *See generally Orn v. City of Tacoma*, No. C13-5974, 2018 WL 1709497, at *9 (W.D. Wash. Apr. 9, 2018), *aff'd*, 949 F.3d 1167 (9th Cir. 2020).

1           *1.    Duty and Breach*

2           California's default rule of duty is codified by § 1714(a) of the California Civil

3    Code.  *Kuciemba v. Victory Woodworks, Inc.*, 531 P.3d 924, 939 (Cal. 2023).  The statute

4    "establishes the default rule that each person has a duty 'to exercise, in his or her activities,

5    reasonable care for the safety of others.'"  *Id.* (*quoting Cabral v. Ralph's Grocery Co.*, 248

6    P.3d 1170, 1172 (Cal. 2011)).  Everyone thus has a duty to avoid creating "unreasonable

7    risk of injury to others" as they go about their days.  *Lugtu v. Cal. Highway Patrol*,

8    28 P.3d 249, 256 (2001) (citations omitted).  Further, this default duty "is the same under

9    all [conceivable] circumstances," unless an exception applies.  *Hacala v. Bird Rides, Inc.*,

10   306 Cal. Rptr. 3d 900, 918 (Ct. App. 2023), *review denied* (June 21, 2023) (alteration in

11   original) (quoting *Cabral*, 248 P.3d at 1183).

12          Foreseeability factors into the duty analysis.[12]  California's default duty of care is

13   owed, specifically, "to the class of persons who it is reasonably foreseeable may be injured

14   as the result of the actor's conduct."  *Lugtu*, 28 P.3d at 256.  Importantly, foreseeability

15   plays a different role here than in causation analysis.  *See Cabral*, 248 P.3d at 1175.  The

16   Court need *not* "decide whether a *particular* plaintiff's injury was reasonably foreseeable

17   in light of a *particular* defendant's conduct," but rather must "evaluate more generally

18   whether the *category* of negligent conduct at issue is sufficiently likely to result in the kind

19   of harm experienced."  *Id.* (third emphasis added) (quoting *Ballard v. Uribe*, 715 P.2d 624,

20   628 n.6 (Cal. 1986)).

21          Accepting all facts alleged in the Complaint as true and drawing reasonable

22   inferences in their favor, the Court finds Plaintiffs have adequately plead that Medina owed

23   them California's statutory default duty of care.  Plaintiffs allege that Medina "owed a duty

24   of reasonable care to each member"[13] of Plaintiffs' family "when he entered their

---

26   [12] The Court notes, as addressed above, that the bar for finding foreseeability here—*i.e.,* in the sense
27   relevant to negligence—is lower than the "substantial certainty" threshold set for inferring intentionality.
     [13] In their Opposition to Defendant's Motion, Plaintiffs argue that Medina owed a duty "to not needlessly
28   discharge pepper spray when the effects of that pepper spray have a fair likelihood of harming those who
     come into contact with it."  Opp'n at 10.  As Defendant correctly notes, however, "[a] motion to

property."  Compl. ¶ 17.  Plaintiffs further claim Medina approached their home and discharged pepper spray onto their property on numerous occasions.  *See id.* ¶¶ 10–11. Viewing this conduct at the generalized level required by California's duty analysis, this Court finds that Medina's actions were "sufficiently likely to result in the kind of harm" Plaintiffs experienced.  And Defendant does not argue that an exception to California's general duty of care applies.  *See generally* Mot.  The Court thus finds Medina had a duty to take reasonable care when using the pepper spray on Plaintiffs' property.

Plaintiffs similarly plead facts sufficient to allege breach.  The Complaint asserts Medina breached his duty because "no reasonable mail carrier would have perceived a risk of harm from Pupa" or "would have used pepper spray on Pupa."  Compl. ¶ 18.  These are "legal conclusions" that this Court need not credit.  *Iqbal*, 556 U.S. at 678.  But the Complaint also alleges that Medina pepper sprayed Pupa before placing mail in Plaintiffs' mailbox, which was located "on the exterior of the home" next to "the exterior side of the front gate," even though Pupa was incapable of "passing through the front gate."  Compl. at ¶¶ 8, 10.  The Complaint further states that "chemical residue" would "remain on Pupa's fur" after each time Medina repeated this conduct, and that Plaintiffs "spen[t] significant time with Pupa each day."  *Id.* at ¶¶ 10–11.  Taking those facts as true, the Court can infer that Medina unreasonably endangered Plaintiffs when he discharged pepper spray into Plaintiffs' yard and onto their dog, thereby breaching the duty he owed.

### 2.    *Causation and Damages*

In California, causation analysis asks two distinct questions.

The first asks whether "the defendant's breach of duty was a cause in fact of [a plaintiff's] injury."  *Union Pac. R.R. Co. v. Ameron Pole Prod. LLC*, 257 Cal. Rptr. 3d 131, 137 (Ct. App. 2019) (citing *Vasquez v. Residential Invs., Inc.*, 12 Cal. Rptr. 3d 846, 861

---

dismiss . . . is ordinarily 'addressed to the four corners of the complaint without consideration of other documents.'"  Reply at 8–9 (quoting *Wolcott v. Meuller*, No. 12-CV-1282, 2013 WL 6795412, at *3 (S.D. Cal. Dec. 20, 2013)).  The Court thus does not consider Plaintiffs' more detailed description of the duty owed by Medina.

23-CV-745 JLS (KSC)

(Ct. App. 2004)).  This analysis itself has two steps.  The first issue is whether a defendant's "breach of its duty . . . was a substantial factor in bringing about plaintiff's harm." *Ortega v. Kmart Corp.*, 36 P.3d 11, 14 (Cal. 2001) (citing *Nola M. v. Univ. of S. Cal.*, 20 Cal. Rptr. 2d 97, 101 (Ct. App. 1993)).  For its part, the substantial factor inquiry essentially looks for "but-for" causation, though it also covers situations in which a "defendant's conduct was one of multiple causes sufficient to cause the alleged harm." *Union Pac.*, 257 Cal. Rptr. 3d at 137 (citation omitted).  The second step asks whether a "rule of law reliev[es] the defendant of liability." *Ortega*, 36 P.3d at 14 (citation omitted).

Beyond the cause-in-fact element, a plaintiff must show "that the defendant's breach was the proximate, or legal, cause of the injury." *Union Pac.*, 257 Cal. Rptr. 3d at 137 (citation omitted).  This second question, proximate causation, is "a normative or evaluative one that asks whether the defendant should owe the plaintiff a legal duty of reasonable care under the circumstances of the case." *Vazquez*, 12 Cal. Rptr. 3d at 861.

With those rules in mind, the Court finds that the Complaint alleges facts sufficient to show causation.  Plaintiffs allege that Medina pepper sprayed Pupa, Compl. ¶ 10; that chemicals from the spray remained in Pupa's fur, *id.* ¶ 11; that Plaintiffs "touched and breathed in the chemical residue" while interacting with Pupa, *id.*; and that Plaintiffs developed "serious respiratory illnesses" as a result, *id.* ¶¶ 12, 19.  This is more than sufficient to establish cause-in-fact.  And because the Court has already concluded that the Complaint sufficiently alleges that Medina owed Plaintiffs a legal duty, "the second component of causation is satisfied." *Vasquez*, 12 Cal Rptr. 3d at 861.  Notably, Defendant does not contend that the Complaint fails to adequately allege causation.  *See generally* Mot.  Indeed, Defendant seems to suggest the opposite.  *See* Reply at 6.

The Court thus finds that the Complaint adequately states a negligence claim under California law.  Accordingly, the Court **DENIES** Defendant's Motion to Dismiss for failure to state a claim pursuant to Rule 12(b)(6).

/ / /

/ / /

### III. USPS as a Defendant

Plaintiffs brings their FTCA claim against both the United States and the USPS. Defendant contends that the USPS is not a proper defendant in this matter. *See* Mot. at 9. Plaintiffs make no argument to the contrary. *See generally* Opp'n.

The only proper defendant in an FTCA action is the United States. *See F.D.I.C. v. Craft*, 157 F.3d 697, 706 (9th Cir. 1998) ("The FTCA . . . *only* allows claims against the United States." (emphasis added)). This feature of the FTCA is a "jurisdictional restriction." *Id.* Even when a claim arises from the conduct of a federal agency, the "agency itself cannot be sued under the FTCA." *Id.* (citing *Shelton v. United States Customs Serv.*, 565 F.2d 1140, 1141 (9th Cir.1977)); *see also Kennedy v. U.S. Postal Serv.*, 145 F.3d 1077, 1078 (9th Cir. 1998) ("A claim against the [USPS] in its own name is not a claim against the United States.").

Because the Court lacks jurisdiction over the agency in this matter, Plaintiffs' FTCA claim against the USPS is **DISMISSED WITH PREJUDICE**.

### IV. Plaintiffs' Requested Relief

Lastly, Defendant moves to dismiss or strike Plaintiffs' demand for "[c]osts incurred in this lawsuit" and "[p]rejudgment interest." *See* Mot. at 10; Compl. at 5. Plaintiffs do not respond to this argument. *See generally* Opp'n.

Defendant is correct; Plaintiffs cannot seek either remedy here. The FTCA explicitly bars claims against the United States for "interest prior to judgment." 28 U.S.C. § 2674. Further, the FTCA does "not waive[] the government's sovereign immunity for attorneys' fees and expenses." *Anderson v. United States*, 127 F.3d 1190, 1191–92 (9th Cir. 1997). The Court thus **DISMISSES WITH PREJUDICE** Plaintiffs' prayers for prejudgment interest and costs incurred in this suit.

/ / /

/ / /

/ / /

/ / /

## CONCLUSION

Given the foregoing, the Court **GRANTS IN PART AND DENIES IN PART** Defendant's Motion to Dismiss (ECF No. 6). Specifically, the Court **DENIES** Defendant's 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, **DENIES** Defendant's 12(b)(6) motion for failure to state a claim, **GRANTS** Defendant's motion to dismiss the USPS as a Defendant in this action, and **GRANTS** Defendant's motion to dismiss Plaintiffs' prayers for prejudgment interest and costs incurred in this suit.

**IT IS SO ORDERED.**

Dated: October 30, 2023

Hon. Janis L. Sammartino
United States District Judge

23-CV-745 JLS (KSC)