UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| A.G., a minor child by and through his Guardian Ad Litem, Alfonso Galindo, Jr.; and R.G., a minor child by and through her Guardian Ad Litem, Alfonso Galindo, Jr., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br> Defendant. | Case No.:  23-CV-745 JLS (GC) <br><br> **STATEMENT OF DECISION** |

The above-captioned case came before the Court for trial without jury on May 11, 12, and 13, 2026.  Attorneys Jason Evans, Thomas Robertson, and Zachary Wallace appeared on behalf of Plaintiffs A.G. and R.G., through their Guardian Ad Litem, Alfonso Galindo, Jr. ("Plaintiffs").  Attorneys Michael A. Garabed and Matthew Riley appeared on behalf of the United States of America ("Defendant").  The Court heard testimony from witnesses Nestor Medina, Ruth Littrell, Alfonso Galindo, Ana Carolina Galindo, Dr. Sean Kohles, Dr. Richard F. Clark, Scott D. Lemons, Dr. Douglas Li, and Dr. David N. Cornfield, as well as the deposition testimony of Plaintiffs A.G. and R.G., Kaitlyn Bohrer, and Diane Venable.  The Court heard opening statements from counsel and admitted exhibits into evidence.  The Parties submitted written Trial Briefs (ECF Nos. 86, 87),

followed by closing arguments on May 21, 2026.

This statement of decision constitutes the Court's findings of fact and conclusions of law.  *See* Fed. R. Civ. P. 52(a)(1).  The findings and conclusions are based on the testimony and evidence admitted at trial and the principles of law that apply to those facts.

## FINDINGS OF FACT

### I.    Undisputed Facts

This case arises from United States Postal Service ("USPS") worker Nestor Medina's ("Mr. Medina") alleged pepper-spraying of the Galindo family dog, Pupa, allegedly causing minor Plaintiffs A.G. and R.G. to develop asthma.  The Parties agree upon the following facts.[1]

### *A.    Mr. Medina*

Mr. Medina has worked at USPS since 2003 and now serves as a Customer Service Supervisor.  Tr. at 33:13–19.  Mr. Medina was assigned to deliver mail to the Galindo family home from May 12, 2018, until March 1, 2019.  SF ¶ 1; Tr. at 34:8–14.  The only times Mr. Medina did not deliver mail to the Galindo family during this period were "off days, periods of leave, and while [he] was assigned to work in San Francisco from December 1–24, 2018."  SF ¶ 2.  Mr. Medina delivered mail to the Galindo family home: eleven days in May 2018; sixteen days in June 2018; twenty days in July 2018; twenty-three days in August 2018; eighteen days in September 2018; twenty days in October 2018; twenty days in November 2018; three days in December 2018; and nineteen days in January 2019.  *Id.* ¶¶ 3–11.  In February 2019, Mr. Medina delivered Mail to the Galindo family home on February 1, 4, 5, 7, 8, 19, 25, 26, 27, 28.  *Id.* ¶ 12.  Mr. Medina also delivered the family's mail on March 1, 2029.  Tr. at 75:14–22.

As required by safety regulations, Mr. Medina carried USPS-issued pepper spray while delivering the mail.  *Id.* at 52:25–53:8, 87:24–88:13.  The pepper spray—"Back off

---

[1] The Parties previously submitted Stipulated Facts to the Court, *see* ECF No. 64, Part D ("SF"), which the Court relies on below.

23-CV-745 JLS (GC)

Dog Repellant"—is made of mineral oil and 0.35% of oleoresin capsicum ("OC"). *Id.* at 296:2–297:16, 340:18–341:11. Mr. Medina typically carried the pepper spray in a holster on his left hand, as well as an extra canister attached to his satchel. *Id.* at 47:20–48:2.

The Galindo family had a home surveillance system that captured Mr. Medina delivering mail on certain days in February 2019 and early March 2019. *See* Ex. 60 (Feb. 1, 2019); Ex. 65 (Feb. 4, 2019); Ex. 68 (Feb. 4, 2019); Ex. 92 (Feb. 5, 2019); Ex. 69 (Feb. 7, 2019); Ex. 71 (Feb. 8, 2019); Ex. 89 (Feb. 25, 2019); Ex. 72 (Feb. 26, 2019); Ex. 73 (Feb. 26, 2019); Ex. 74 (Feb. 26, 2019); Ex. 79 (Feb 27, 2019); Ex. 91 (Feb. 28, 2019); Ex. 80 (Mar. 1, 2019). After reviewing the surveillance footage, Plaintiffs' father, Alfonso Galindo ("Mr. Galindo"), sent an email to the postmaster, alleging that the mailman, Mr. Medina, pepper-sprayed the family's dog.[2] Tr. at 136:14–137:4. Mr. Medina stopped delivering mail to the Galindo family home shortly thereafter. *Id.* at 34:15–24.

### B.    A.G. and R.G.

Minor Plaintiffs A.G. and R.G. were born on August 10, 2015, and September 25, 2017, respectively. Tr. at 222:24–223:2. As children, and during the period at issue in this case, Plaintiffs kept regular close contact with their family dog, Pupa. *Id.* at 141:19–142:9. At some point between 2018 and 2019, Plaintiffs developed asthma, which Plaintiffs' parents eventually came to believe was caused by pepper spray on Pupa's fur. *See* Ex. 497 at USA-03729. During this period, Plaintiffs visited the doctor on numerous occasions. On March 30, 2018, A.G. and R.G. visited the doctor for a cough and congestion lasting over a month. Exs. 474, 475. On June 27, 2018, R.G. visited the doctor for a fever. Ex. 599 at P000043. On July 2, 2018, R.G. went to urgent care for coughing, congestion, a sore throat, and a fever. Ex. 600 at P000126–27. On July 6, 2018, R.G. went to the doctor for coughing and congestion and was diagnosed with upper respiratory congestion. Ex.

---

[2] Although Mr. Medina disputes ever pepper-spraying Pupa, the Parties agree that another mailman pepper-sprayed Pupa on February 16, 2019, when Pupa was outside of the front gate without a leash. SF ¶¶ 19–21; Tr. at 137:5–138:18. Following the incident, the Galindo family took Pupa to the groomers to remove the pepper-spray from his fur. Tr. at 175:5–14.

23-CV-745 JLS (GC)

595 at USA-07365. On September 9, 2018, A.G. visited urgent care for coughing, congestion, and a fever, and was diagnosed with acute bronchitis. Ex. 603 at P000807–08. On October 12, 2018, R.G. visited the doctor for a cough. Ex. 477 at USA-07363. On October 16, 2018, A.G. visited the doctor for an ear infection and speech delay, and reported symptoms of congestion, coughing, and a runny nose. Ex. 493 at USA-03323. A.G. also began attending preschool in 2018. Tr. at 224:11–13; Ex. 597A.

On January 3, 2019, A.G. visited the doctor for congestion, ear pain, a runny nose, a cough, and an upper respiratory infection, and was diagnosed with an acute ear infection and common cold. Ex. 622 at USA-03455–56. On January 18, 2019, R.G. visited the doctor for a cough and cold and was diagnosed with an acute upper respiratory infection. Ex. 595 at USA-07361–62. On January 30, 2019, A.G. visited the doctor for a runny nose, cough, and congestion, and was diagnosed with an upper respiratory infection and cough. Ex. 623 at USA-03519–20. R.G. also visited the doctor for a runny nose, cough, and congestion. Ex. 630 at USA-07594. On February 4, 2019, R.G. visited the doctor for a month-long cough and was diagnosed with asthma. Ex. 599 at P000036.

In the spring of 2019, Plaintiffs' symptoms improved. On April 2, 2019, A.G. visited the doctor and reported being "asymptomatic[,] as in no cough or nasal discharge/congestion" since the first week of March and had a normal pulmonary exam. Ex. 497 at USA-03729–31. On April 18, 2019, R.G. visited the doctor for a "routine child health examination without abnormal findings." Ex. 595 at USA-07358. On August 20, 2019, A.G. visited the doctor and reported that he was "[symptom]-free this summer with no concerns." Ex. 482 at USA-4783.

This trend generally continued into 2020. On January 17, 2020, A.G. visited the doctor and reported occasional coughing and colds. Ex. 627 at USA-06374. On March 3, 2020, Plaintiffs visited the doctor, and the doctor reported a diagnosis of mild persistent asthma. Ex. 499 at USA-03938; Ex. 500 at USA-07800. On March 17, 2020, R.G. visited the doctor after fracturing her arm and reported having no cough or congestion. Ex. 633 at USA-07871. On August 12, 2020, A.G. visited the doctor for a cough but reported overall

23-CV-745 JLS (GC)

improved symptoms.  Ex. 501 at USA-04060.  R.G. also visited the doctor and reported improved symptoms.  Ex. 502 at USA-08153.

On December 20, 2021, R.G. visited the doctor and reported no asthma or respiratory issues.  Ex. 595 at USA-07345.  A.G. and R.G. both contracted COVID in January 2022.  SF ¶¶ 23–26.  On March 17, 2022, R.G. visited the doctor and reported that she was using an asthma inhaler daily and "doing much better."  Ex. 595 at USA-07338.  On April 4, 2022, R.G. visited the doctor, who noted that she had no recent asthma flare-ups.  Ex. 595 at USA-07333–07334.  A.G. and R.G. contracted COVID again in January 2024.  SF ¶¶ 23–26.  On August 15, 2024, R.G. visited the doctor and did not discuss asthma.  Ex. 490.

Around 2023 to 2024, Plaintiffs also began participating in various activities.  A.G. participated in Little League baseball, took swim and tennis lessons, and played soccer and basketball.  Tr. at 166:1–15, 183:4–21, 184:11–13; SF at 27–30; Ex. 619 at 40:17–41:12.  R.G. similarly participated in Little League and took swim and tennis lessons.  Tr. at 163:18–21, 183:4–184:18.  Plaintiffs also occasionally helped clean equipment for their parents' party equipment rental business.  *Id.* at 228:8–12.

## II.    Disputed Facts

The primary factual issues in this case are whether Mr. Medina pepper-sprayed Pupa, and if he did, when the pepper-spraying occurred.  Plaintiffs contend that Mr. Medina pepper-sprayed Pupa throughout the ten-month period he delivered mail to the Galindo family home, including the days in February 2019 for which there is video footage of Mr. Medina delivering mail—February 1, 4, 7, 8, 26, 27, and 28.  Pls. Br. at 2.  Defendant argues that Mr. Medina never pepper-sprayed Pupa.[3]  ECF No. 86 ("Def. Br.") at 3–4.

The Court finds that Mr. Medina pepper-sprayed Pupa on February 1, 4, and 26, 2019.  The video surveillance footage from these dates depicts Mr. Medina walking towards the Galindo family home, holding pepper spray in his hand, and approaching the

---

[3] Though Defendant submits that if the Court is not convinced of so, it should find that Mr. Medina pepper-sprayed Pupa only on February 1, 4, and 26, 2019.  Def. Br. at 4.  For the reasons discussed below, the Court agrees with this approach.

23-CV-745 JLS (GC)

front gate before delivering mail to the mailbox.  *See* Ex. 60 (Feb. 1, 2019); Ex. 65 (Feb. 4, 2019); Ex. 68 (Feb. 4, 2019); Ex. 72 (Feb. 26, 2019); Ex. 73 (Feb. 26, 2019).  The video footage shows an immediate reaction from Pupa; after Mr. Medina walks by the gate, Pupa rubs his face on the ground.  In other words, the video footage from these dates shows Mr. Medina pepper-spraying Pupa when delivering mail to the Galindo family home.  The Court does not find testimony to the contrary credible.  *See, e.g.*, Tr. at 45:20–25, 46:1–2, 54:7–12, 68:8–10.

Plaintiffs failed to present sufficient evidence that pepper-spraying occurred outside the dates for which there is video surveillance footage of Mr. Medina walking by the front gate while holding pepper spray and a corresponding reaction from Pupa.  Mr. Galindo testified that for several months before February 2019 he noticed "spray patterns" on the patio brick behind the gate where Pupa remained when Mr. Medina delivered the mail.  Tr. at 171:11–23, 205:6–8; *see also* Ex. 101.  But neither Mr. Galindo nor Mrs. Galindo testified that they saw or smelled pepper spray any day after Mr. Medina delivered the mail to the family's home.[4]  Tr. at 175:1–4, 243:24–244:1.  Furthermore, Plaintiffs argue that because Mr. Medina "takes the same clandestine approach with his right hand holding the OC spray canister, while his left hand holds the mail on top of the canister" on February 7, 8, and 27 as he did on February 1, 4, and 26, "compelling evidence supports a finding of pepper spray by a preponderance of the evidence."  Pls. Br. at 2.  However, the video footage for these dates does not show a corresponding reaction from Pupa.  Nor does the video footage show pepper spray being sprayed into the air.  Therefore, the Court cannot conclude that the pepper spraying occurred on any additional dates outside of February 1, 4, and 26, 2019.

/ / /

/ / /

---

[4] Whereas after the pepper spray incident on February 16, 2029, Mr. Galindo testified that there was a "significant amount of pepper spray" on Pupa that was difficult to wash off.  Tr. at 139:8–20.

23-CV-745 JLS (GC)

**CONCLUSIONS OF LAW**

## I.        Legal Standard

When a party sues the federal government, subject matter jurisdiction exists only when the law on which such action is based contains an explicit waiver of sovereign immunity, as "[i]t is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell*, 463 U.S. 206, 212 (1983).  "[W]hen Congress attaches conditions to legislation waiving the sovereign immunity of the United States, those conditions must be strictly observed." *Block v. N. Dakota ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 287 (1983).

The Federal Torts Claim Act ("FTCA") provides for a limited waiver of sovereign immunity and allows plaintiffs to seek damages against the United States for certain torts committed by federal employees.  *See* 28 U.S.C. §§ 1346(b), 2674.  More specifically, the FTCA "provides a waiver of sovereign immunity for tortious acts of an agency's employees only if such torts committed in the employ of a private person would have given rise to liability under state law." *Pereira v. U.S. Postal Serv.*, 964 F.2d 873, 876 (9th Cir. 1992) (citations omitted).

"[W]hen a claim is not barred by one of the [FTCA]'s exclusionary provisions, the liability of the Government must be determined 'in accordance with the law of the place where the act or omission occurred.'" *United States v. Neustadt*, 366 U.S. 696, 705 n.15 (1961) (quoting 28 U.S.C. § 1346(b)).  To establish negligence under California law, a plaintiff "must demonstrate a legal duty to use due care, a breach of such legal duty, and that the breach is the proximate or legal cause of the resulting injury." *Kesner v. Superior Ct.*, 1 Cal. 5th 1132, 1142 (2016) (cleaned up) (internal quotation marks and citations omitted).  A plaintiff has the burden to prove a defendant's negligence by a preponderance of the evidence. *Woodman v. United States*, No. 8:23-CV-01736-AH-(ADSX), 2025 WL 1783706, at *5 (C.D. Cal. Apr. 24, 2025) (citation omitted).

/ / /

/ / /

23-CV-745 JLS (GC)

## II.    Analysis

### A.    Duty and Breach

California's default rule of duty is codified by § 1714(a) of the California Civil Code. *Kuciemba v. Victory Woodworks, Inc.*, 14 Cal. 5th 993, 1016 (2023).   The statute "establishes the default rule that each person has a duty 'to exercise, in his or her activities, reasonable care for the safety of others.'" *Id.* (quoting *Cabral v. Ralph's Grocery Co.*, 51 Cal. 4th 764, 768 (2011)).   Everyone thus has a duty to avoid creating "unreasonable risk of injury to others." *Lugtu v. Cal. Highway Patrol*, 26 Cal. 4th 703, 716 (2001) (citations omitted).   This default duty "is the same under all [conceivable] circumstances," unless an exception applies. *Hacala v. Bird Rides, Inc.*, 90 Cal. App. 5th 292, 314 (2023), *review denied* (June 21, 2023) (alteration in original) (quoting *Cabral*, 51 Cal. 4th at 784).

The Parties do not dispute that Mr. Medina had a duty to take reasonable care when delivering mail to the Galindo family home.   As to whether that duty was breached, Plaintiffs argued at trial that Mr. Medina breached the duty of care when he repeatedly pepper-sprayed Pupa over the course of his assignment to their home. *See* Pls. Br. at 2. Defendant argued that no duty was breached because Mr. Medina never pepper-sprayed Pupa. *See* Def. Br. at 2.

The Court concludes that Mr. Medina breached the duty of care when he pepper-sprayed Pupa on February 1, 4, and 26, 2019.   In pepper-spraying Pupa, Mr. Medina sprayed an inflammatory chemical—indeed, one created to cause irritation—onto Plaintiffs' family's property without provocation.   Such conduct created an "unreasonable risk of injury to others," and thus, was a violation of the duty of care owed when delivering mail to the Galindo family home.[5]

/ / /

/ / /

---

[5] The Court also notes that USPS policy permits employees to use repellent only when a dog attacks.  Tr. at 361:2–7.  Mr. Medina violated that policy when he pepper-sprayed Pupa, unprovoked.

23-CV-745 JLS (GC)

**B.      Causation and Damages**

Under California law, a defendant's breach of duty must be a cause in fact and proximate cause of a plaintiff's injury. *Union Pac. R.R. Co. v. Ameron Pole Prod. LLC*, 43 Cal. App. 5th 974, 980 (2019) (citations omitted). To be a "cause in fact" of a plaintiff's injury, a defendant's breach of duty must be "a substantial factor in bringing about plaintiff's harm." *Ortega v. Kmart Corp.*, 26 Cal. 4th 1200, 1205 (2001) (citing *Nola M. v. Univ. of S. Cal.*, 16 Cal. App. 4th 421, 427 (1993)). A defendant's conduct may qualify as a "substantial factor" even if it is "one of multiple causes," so long as it is "sufficient to cause the alleged harm." *Union Pac.*, 43 Cal. App. 5th at 981 (citation omitted). Courts also consider whether the "rule of law reliev[es] the defendant of liability" in evaluating cause in fact. *Ortega*, 26 Cal. 4th at 1205 (citation omitted). To be the "proximate, or legal, cause of the injury," courts inquire "whether the defendant should owe the plaintiff a legal duty of reasonable care under the circumstances of the case." *Union Pac.*, 43 Cal. App. 5th at 980 (citation omitted); *Vasquez v. Residential Invs., Inc.*, 118 Cal. App. 4th 269, 288 (2004) (citation omitted).

While duty and breach are relatively straightforward in this case, the most significant question to answer is whether Mr. Medina's pepper-spraying of Pupa on February 1, 4, and 26, 2019, caused or contributed to Plaintiffs' developing asthma. The Court concludes that Mr. Medina's pepper-spraying Pupa did not cause or contribute to Plaintiffs' asthma. The Court considered the testimony of several expert witnesses in reaching its conclusion.

First, the Court heard from Plaintiffs' expert witness, Dr. Sean Kohles ("Dr. Kohles"), a biomechanical engineer and professor at Oregon Health and Science University in biomaterials and biomechanics. Dr. Kohles' testimony confirmed that it was conceivable for pepper spray to "flow through the air, land[] on a target, dispers[e], [and] evaporate[e] from that target onto . . . in this case, . . . human beings." Tr. at 267:7–10. The Court also heard from Defendant's expert witness, Dr. Richard F. Clark ("Dr. Clark"), a board-certified emergency physician, medical toxicologist, and professor of emergency medicine at the University of California, San Diego. In his review of the record in this

case, he did not see "any evidence . . . of a measurable amount of pepper spray that the children were exposed to." *Id.* at 321:18–20.  Dr. Clark also testified that, looking to the literature, secondhand exposure to pepper spray has "never caused clinical symptoms of respiratory problems in anyone . . . especially children."[6]  *Id.* at 321:25–322:9.

Also, the Court has carefully weighed and considered the expert testimony of Plaintiffs' witness, Dr. Douglas Li ("Dr. Li"), and Defendant's witness, Dr. David N. Cornfield ("Dr. Cornfield"), in reaching its conclusion.

The Court first heard from Dr. Li.  Dr. Li is a board-certified pediatric pulmonologist who serves as division chief for pediatric pulmonology at University of California, Los Angeles Health.  *See* Tr. at 373:25–375:8.  Based on his review of the evidence, Dr. Li determined that "the OC spray was causal in [Plaintiffs'] asthma" because "it was biologically plausible," "the timing was such that exposure made sense," and there was a "lack of other explanations." *Id.* at 378:12–16, 379:8–11.  Dr. Li testified that asthma is a result of "inflammation and spasming of the airways," and is typically "intermittent." *Id.* at 395:13–22.  In other words, asthma is triggered by exposure to irritants. *Id.* at 400:24–401:5.  As with other irritants, Dr. Li explained, oleoresin capsicum (OC) can cause asthma in children. *Id.* at 406:12–407:2.  Dr. Li based this opinion in part on his review of the literature, which suggests that adults can develop asthma as a result of OC exposure. *Id.* at 408:3–410:14.  Based on his knowledge of the physiology of children, he concluded that they, too, could develop asthma from OC exposure. *Id.* at 409:23–410:6.  Dr. Li ultimately determined that pepper spray exposure caused Plaintiffs' asthma because the alleged pepper-spraying coincided with their development of asthma.  *See id.* at 421:14–427:1, 457:8–15 (discussing Plaintiffs' medical records from 2018 through 2019 and testifying that, based on his understanding of the facts, pepper spray exposure occurred from the fall of 2018 to February 2019).  Dr. Li further testified, when questioned by the Court, that

---

[6] Though Plaintiffs' witness, Dr. Douglas Li, pointed out at trial that a study of children's exposure to pepper spray does not and will never exist for clear ethical reasons.  Tr. at 408:3–15.

23-CV-745 JLS (GC)

even if Plaintiffs' exposure occurred only in February 2019, his opinion would not change, given that Plaintiffs' symptoms continued. *Id.* at 457:8–459:2.

Dr. Li also eliminated alternative causes of Plaintiffs' asthma. He found that "brief exposure" to cleaning products was insufficient to cause their asthma. Tr. at 413:20–414:25. He found that Plaintiffs lived too far from the freeway for pollution to be a potential cause. *Id.* at 415:1–416:6. He also excluded marijuana smoke as a potential cause because the data did not support a connection between marijuana and asthma, and in this case, Plaintiffs "weren't directly exposed to th[e] secondhand" marijuana smoke. *Id.* at 416:10–418:8. Lastly, he excluded viral infections as a potential cause based on the timing and severity of viral infections; there was not a viral infection in either Plaintiff "significant enough to cause that acute worsening [of asthma] during . . . fall to winter 2018 and '19." *Id.* at 418:16–419:3. He explained that he did not see "that there was one . . . really clear[ly] bad . . . hospitalization . . . or very severe episode of a viral infection that would have caused that acute worsening" of asthma. *Id.* at 419:5–8.

The Court next heard from Dr. Cornfield. Dr. Cornfield is a board-certified pediatric pulmonologist who currently serves as a professor of pulmonary medicine and the division director of pediatric pulmonary, asthma, and sleep medicine at Standford University. Tr. at 507:12–17. Based on his review of the evidence, Dr. Cornfield's opinion in this case was that Plaintiffs had "viral-associated asthma." *Id.* at 511:9–23. He explained that Plaintiffs "had a number of viruses early in life, and with several of those viral upper respiratory tract infections[,] they experienced lower tract symptoms, which include cough and episodic wheezing." *Id.* at 508:23–509:2. "[I]n general, these illnesses were within the boundaries of what we might expect for the frequency and severity of upper respiratory tract disease," and "with that[,] there was a component of viral-associated wheeze/cough or what people will term 'viral-associated asthma.'" *Id.* at 509:2–6. Dr. Cornfield testified that periods of exacerbation were "consistent with what [he] would see for a child of that age . . . with a viral infection." *Id.* at 523:12–14.

/ / /

23-CV-745 JLS (GC)

As to pepper spray exposure, Dr. Cornfield testified that he did "not believe that the exposure to pepper spray from the dog played a pathogenic role in the development and the ongoing viral-associated asthma that [Plaintiffs] experienced." Tr. at 544:2–4. He testified that there is a "dramatically, vanishingly small likelihood that pepper spray on a dog could be a provocant for long-term longitudinal asthma in a child." *Id.* at 516:20–22. He explained that "to aerosolize a molecule is not straightforward," and "[g]iven the fact that a dog's fur is generally very absorbent . . . if you get pepper spray on a dog," it is difficult to "conceive of how that would get subsequently aerosolized." *Id.* at 516:25–517:1, 518:1–4. Contrary to Dr. Li's opinion, Dr. Cornfield "did not believe . . . the notion that the pepper spray was causative in any manner" because the pepper spray could not "have gotten into the lower airway in a manner that caused a chronic problem with would-be asthma." *Id.* at 532:2–6. Dr. Cornfield did testify that, hypothetically, if children were exposed to aerosolized OC on a chronic basis, they could get asthma. *Id.* at 544:20–545:8. But that, he explained, was not what happened in this case. *Id.* at 545:22–546:1. Dr. Cornfield also testified that a hoard of additional factors can contribute to respiratory symptoms in children, such as family history, secondhand smoke, a wood-burning stove, dust mites, diesel pollutants, and, in this case, "intimate exposure to cleaning solvents." *Id.* at 532:16–533:6, 534:5–6. Dr. Cornfield ultimately opined that Plaintiffs' asthma would not limit their physical activity. *Id.* at 534:18–19.

The Court found both Dr. Li and Dr. Cornfield highly credible and well-qualified. However, given the evidence in this case, the Court was ultimately persuaded by Dr. Cornfield's opinion that Plaintiffs suffered from viral-associated asthma. As Dr. Cornfield testified, viral illnesses—and viral-associated asthma—are commonplace in young children. *See* Tr. at 526:7–10. Dr. Li also agreed that viral respiratory infections are generally one of the main causes of asthma in children. *Id.* at 455:3–10. And, here, the evidence points to Plaintiffs suffering from several periods of viral illness that developed into asthma. Although Dr. Li's testimony was persuasive—and Dr. Cornfield, too, acknowledged that OC in pepper spray could potentially cause inflammation such that

23-CV-745 JLS (GC)

asthma is triggered—given the Court's finding that Mr. Medina pepper-sprayed Pupa on three days in February 2019, the Court cannot conclude that the pepper-spraying caused Plaintiffs' asthma, which began much earlier. Dr. Li's ultimate opinion as to causation was based on his assumptions about the facts in this case, i.e., that the pepper spraying occurred during a longer period from 2018 to 2019. His opinion loses force as a result of the Court's factual finding that pepper-spraying occurred only on February 1, 4, and 26, 2019.

Nor can the Court conclude that the pepper spray exacerbated Plaintiffs' asthma, as, according to Dr. Cornfield, the pepper spray would not have aerosolized and entered Plaintiffs' airways. This is reinforced by the fact that no one in the Galindo family testified as to having other symptoms—e.g., itchiness of the face or eyes—or ever seeing or smelling pepper spray on or near Pupa. *See* Tr. at 559:18–22 ("[T]he fact that there was no evidence in the voluminous materials that [Dr. Cornfield] reviewed of any sort of mucosal inoculation or anger or redness or itching eyes or pain, it makes [him] think that the exposure was exceedingly constrained."). The Court therefore concludes that Plaintiffs have not established by a preponderance of the evidence that pepper spray caused their asthma. Because the Court concludes so, it need not address the Parties' arguments as to damages.

## CONCLUSION

Having duly considered the testimony and evidence admitted at trial and the law, the Court **HEREBY FINDS** that Plaintiffs have not met their burden of establishing, by a preponderance of the evidence, that Nestor Medina's pepper-spraying of their family dog caused them to develop asthma. Accordingly, the Court **FINDS IN FAVOR OF DEFENDANT**. A proposed judgment consistent with this Order shall be lodged by Defendant <u>within seven (7) days</u> from the date on which this Order is electronically docketed.

**IT IS SO ORDERED.**

Dated: July 2, 2026

*Janis L. Sammartino*
Hon. Janis L. Sammartino
United States District Judge

13

23-CV-745 JLS (GC)